

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

L.K.,

            Plaintiff,

—v—

New York City Department of Education,

           Defendant.

14-cv-7971 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    Plaintiffs S.K. and J.W. ("the Parents") are the parents of L.K., a seven-year-old boy who has been diagnosed with autism, pervasive development disorder, and apraxia. They bring suit on L.K.'s behalf pursuant to the Individuals with Disabilities Education Act ("IDEA") against the New York City Department of Education ("the Department"), and they challenge the administrative decision of a State Review Officer ("SRO") who concluded that the Parents are not entitled to full reimbursement for the home and community-based services provided to L.K. during the 2013-2014 school year. The parents provided those services, in addition to enrolling L.K. at a private school for students with disabilities, in the wake of the Department's failure to develop an Individualized Education Plan for L.K. that would provide the free appropriate publication education required by the IDEA. Although the SRO determined that the Parents' placement for L.K.—encompassing both the private school and the additional services—was appropriate, he concluded that equitable considerations supported a reduced reimbursement for the Parents on the grounds that some of the services they procured for L.K. exceeded what the Department was obligated to provide under the IDEA.

1

The Parents and the Department have each moved for summary judgment.[1] The Parents seek a determination that they are entitled to full reimbursement and that they are "substantially prevailing" parties for the purpose of submitting an application for attorneys' fees and costs. The Department does not challenge the SRO's conclusion that the Parents' placement for L.K. was appropriate, but it seeks summary judgment with respect to the SRO's decision that the Parents should receive less than full reimbursement for the services they provided L.K. For the reasons that follow, the Department's motion is GRANTED, and the Parents' motion is DENIED, except with respect to the question of whether the Parents were "prevailing parties."

I.  BACKGROUND

A.  **Statutory Background**

Congress enacted what is now known as the IDEA in 1970, with the principal purpose of ensuring that "all children with disabilities have available to them a free appropriate public education," known as a "FAPE," which "emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). States that provide a FAPE to all children with disabilities are eligible to receive certain federal funds. 20 U.S.C. § 1412(a)(1)(A).

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006) (quotation marks and citation omitted); *see also* 20 U.S.C. § 1414(d)(1)(A) (defining "IEP"). An IEP must be "reasonably calculated to enable the child to receive

---

[1] The Parents title their motion a "motion for a modified *de novo* review," but in form and substance it is a motion for summary judgment. *See* Dkt. Nos. 18, 25.

educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982).

To satisfy the IDEA's definition of a FAPE, the services provided pursuant to an IEP must "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B). In New York, the "responsibility for developing appropriate IEPs" has been assigned to local Committees on Special Education ("CSE"). *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (quotation marks and citation omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1). Each CSE must include, at a minimum, "the student's parent(s); a special education teacher; a regular education teacher if the student participates in a regular education program; a school psychologist; a school district representative; an individual who can interpret the instructional implications of evaluation results; a school physician; and a parent of another student with a disability." *D.M. v. City Sch. Dist. of the City of N.Y.*, No. 15-CV-1619 (LGS), 2016 WL 319859, at *1 (S.D.N.Y. Jan. 26, 2016).

After an IEP has been developed and proposed, a parent who is dissatisfied may file a due process complaint challenging the IEP before an impartial hearing officer ("IHO") appointed by the local board of education. N.Y. Educ. Law § 4404(1). The parties may appeal an adverse decision by the IHO to a State Review Officer ("SRO"). *See id.* § 4404(2). An SRO must conduct "an impartial review of the [IHO's] findings and decision" and render an independent decision. 20 U.S.C. § 1415(g)(2). The SRO's decision is the final administrative determination, but it may be challenged in either state or federal court. *Id.* § 1415(i)(2)(A).

For "parents who think that the state has failed to offer their child a FAPE," the IDEA permits them "to pay for private services, including private schooling, and then seek reimbursement from the school district." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); *see also* 20 U.S.C. § 1412(a)(10)(C). Courts have developed a three-pronged inquiry, known as the "*Burlington/Carter* test," for determining whether a parent who takes such action is entitled to reimbursement. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985); *Florence Cty. Sch. Dist. Four v. Carter*

3

*By & Through Carter*, 510 U.S. 7 (1993). First, at "Prong I," the Department "must establish that the student's IEP actually provided a FAPE." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). If the Department carries its burden at Prong I, the inquiry is over. But if the Department "fail[s] to meet that burden," then the parents must show at "Prong II" that "their unilateral placement was appropriate" and at "Prong III" that "the equities favor them." *Id.* Parents that make such a showing are entitled to full reimbursement.

### B.  Factual and Procedural Background[2]

L.K. has been diagnosed with PDD-NOS (pervasive development disorder—not otherwise specified), autism, and apraxia. Def. 56.1 CS ¶ 1. Although the parties dispute, to an extent, the specific areas in which L.K. presents with significant and severe deficits, the IHO characterized L.K.'s disability as "severe" and the SRO found that L.K.'s providers testified to his "severe delays and significant needs that required . . . intensive intervention." *Id.* ¶¶ 4-13. A CSE team convened on March 4, 2013, to develop an IEP for L.K for the 2013-2014 school year. Pl. 56.1 CS ¶ 4. Both of L.K.'s parents attended and participated in the meeting. *Id.* ¶ 5. The resulting IEP included a recommendation that L.K. be placed in a 12:1:1 class (where there would be a maximum of twelve students, one teacher, and one paraprofessional) in a specialized school, as well as recommendations that L.K. receive additional related services. *Id.* ¶¶ 7, 8. Those services included occupational therapy ("OT") for three thirty-minute sessions a week on a one-to-one basis, physical therapy ("PT") for two thirty-minutes sessions a week on a one-to-one basis, and speech-language therapy ("SLT") for three thirty-minute sessions a week on a one-to-one basis. *Id.* ¶ 8.

---

[2] Unless otherwise indicated, the facts described herein are undisputed. The Court relies principally on the counterstatements of material facts submitted by the parties, i.e., Plaintiff's Objections to Defendant's Local Rule 56.1 Statement of Material Facts ("Pl. 56.1 CS") and Defendant's Objections and Responses to Plaintiff's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1 CS"). At the outset of the Department's 56.1 counterstatement, the Department notes that the Parents' Statement "is argumentative[] and states propositions of law and legal conclusions instead of statements of material facts in plain violation of Local Civil Rule 56.1(a)." Def. 56.1 CS at 1. The Court agrees, though it declines the Department's suggestion that the Parents' Statement "not be considered by this Court." *Id.* at 2. Rather, the Court considers only the legal arguments raised in the memoranda of law submitted by the parties.

The CSE also determined that, given L.K.'s needs, he required a year-round educational program. *Id.* ¶ 9. Accordingly, a Committee on Preschool Special Education ("CPSE") convened on March 20, 2013, to develop an IEP that would cover July and August of 2013—i.e., until the IEP for the 2013-2014 school year took effect. *Id.* ¶ 9. Prior to the summer of 2013, L.K. had attended pre-school, received at least 20 hours of Applied Behavior Analysis ("ABA") therapy a week, and received home and community-based speech therapy and occupational therapy. Def. 56.1 CS ¶¶ 24, 25. The Parents privately paid for at least ten hours of the ABA therapy. *Id.* ¶ 24. The IEP that the CPSE developed for the summary of 2013 recommended twenty-five hours of one-to-one special education services at home, as well as OT, SLT, and PT services. Pl. 56.1 CS ¶ 10. The parents did not object to the CPSE recommendations and accepted the July-August 2013 program for L.K. *Id.* ¶ 13.

As of the spring of 2013, the Parents had not, however, accepted the CSE's recommendations for the 2013-2014 school year. L.K.'s mother testified that she was puzzled as to how one team, the CPSE, "could find that [L.K.] required 1:1 ABA . . . for 25 hours" but that another team, the CSE, "recommend[ed] a 12:1:1 classroom with no 1:1 support or instruction at all." Def. 56.1 CS ¶ 32. On April 2, 2013, the Parents signed a contract enrolling L.K. at the Manhattan Childrens Center school ("MCC") for the 2013-14 school year. Pl. 56.1 CS ¶ 14. On May 24, 2013, the Department provided the Parents a final notice of its recommendation for the 2013-2014 school year—L.K.'s kindergarten year—that reiterated the recommendations from the IEP developed by the CSE. *Id.* ¶ 16. The Parents expressed their concerns about these recommendation in a July 18, 2013 letter and requested a new CSE meeting. *Id.* ¶¶ 17, 19. The Parents never heard back. Def. 56.1 CS ¶ 43. A month later, the Parents wrote to the CSE and explained that they were rejecting the placement recommended in the IEP and would instead seek reimbursement for the tuition at MCC, as well as for transportation expenses and home-based services. Pl. 56.1 CS ¶ 20. The Parents nonetheless made substantial efforts to visit the school that had been recommended for L.K. and to contact its

administrators, but they received no response until after the 2013-2014 school year had started. Def. 56.1 CS ¶¶ 43-46.

The Parents again wrote to the CSE on September 18, 2013, and confirmed that they were placing L.K. at MCC for the 2013-2014 school year and would continue to provide home and community-based services to supplement the services provided at MCC. Pl. 56.1 ¶¶ 21-23. L.K. attended MCC five days a week for six hours a day. *Id.* ¶ 26. He was in a classroom that included a total of six students, five instructors, and one lead teacher. *Id.* ¶ 25. Each school day consisted of five hours of 1:1 ABA instruction and one hour of instructional lunch and leisure skills, where the student to instructor ratio was 2:1. *Id.* ¶ 27. The staff at MCC worked on the followings skills with L.K.: communication, generalization, academics, toileting, independent play, social skills, self-management, and behavior management. *Id.* ¶ 28. The MCC curriculum also included three 30-minute 1:1 SLT sessions per week, one 30-minute group SLT consultation per week, two 30-minute 1:1 OT sessions per week, one 30-minute group OT session per week, and one 30-minute OT lunch consultation per week. *Id.* ¶ 30. Outside of MCC, L.K. received the following home and community-based services: four 45-minute SLT sessions per week; two 45-minute after-school OT sessions and approximately four hours of OT at an OT gym per week; one hour of home-based PT per week; and 18 hours per week of 1:1 ABA therapy. *Id.* ¶ 32.

The litigation over L.K.'s placement began when the Parents filed a Due Process Complaint on August 29, 2013. *Id.* ¶ 34. They sought a hearing before an IHO to obtain tuition reimbursement for L.K.'s placement at MCC and for the additional home and community-based services he received during the 2013-2014 school year. *Id.* The Parents also sought an interim order from the IHO establishing L.K.'s pendency entitlement—i.e., the services that L.K. would be entitled to receive during the pendency of the ensuing proceedings. *Id.* ¶ 35. The Parents contended, and the Department did not contest, that the IEP prepared by the CPSE—i.e., the IEP that covered July and August of 2013—represented the last agreed-upon placement for L.K. *Id.* ¶ 36. Accordingly, on December 12, 2013, IHO Michael Lazan issued an Order on Pendency

that specified a "stay put" placement for the services recommended in the summer 2013 IEP. *Id.* ¶ 38.[3]

On March 19 and March 26, 2014, a different IHO (Mary Noe) held a hearing on the Parents' Due Process Complaint. *Id.* ¶ 40. The Department conceded at the hearing that it had not provided L.K. a FAPE for the 2013-2014 school year. *Id.* ¶ 41. The IHO nonetheless denied the Parents' claim because she found that they had failed to meet their burden, under Prong II of the *Burlington/Carter* test, to demonstrate that the combination of L.K.'s enrollment at MCC and his slate of additional services constituted an appropriate placement. McGinley Aff., Dkt. No. 20, Ex. B ("IHO Op.") at 8-9.

The Parents appealed the IHO's decision to the SRO. Pl. 56.1 CS ¶ 44. On September 19, 2014, the SRO issued a decision that sustained in part and denied in part the Parents' appeal. McGinley Aff., Dkt. No. 20, Ex. A ("SRO Op.") at 12. The SRO agreed with the Parents that the IHO had "failed to consider the evidence in the hearing record" and reversed the IHO's determination with respect to Prong II. *Id.* at 7. Specifically, he concluded that the Parents' "unilateral placement of the student," including the home and community-based services they procured, "is appropriate and addresses the student's special education needs." *Id.* In reaching that conclusion, the SRO rejected the Department's argument that the additional services were inappropriate because they were for the purpose of "generalizing skills." *Id.* But the SRO nonetheless determined that, although full reimbursement for tuition at MCC was appropriate, equitable considerations did not require fully reimbursing the Parents for L.K.'s home and community-based services. *Id.* at 11. In his analysis on this point—Prong III of the *Burlington/Carter* inquiry—the SRO *did* consider the Department's argument about generalizing skills, on the grounds that "a reduction from full reimbursement may be considered where a

---

[3] These services were essentially the same as the home and community-based services L.K. was receiving at the start of the 2013-2014 school year, albeit with a few minor differences. *Compare, e.g.*, Pl. 56.1 CS ¶ 32 (two 45-minute after-school OT sessions), *with id.* ¶ 38 (three 30-minute one-to-one OT sessions). But in substance, the quantity of services was essentially the same, and as explained *infra*, the SRO treated the home and community-based services L.K. received during the 2013-2014 school year as covered by his pendency entitlement.

7

unilateral placement provides services beyond those required to address a student's educational needs." *Id.* at 8. Accordingly, the SRO concluded that "equity does not require . . . the district to reimburse the parents for home and community-based services for the purpose of the generalization of skills, in addition to the school day services at [MCC]." *Id.* at 11. Despite reaching that conclusion, the SRO explained that he did not need to determine a specific amount by which to reduce reimbursement for the home and community-based services because the school district had already been required to fund them under the Pendency Order. *Id.* at 12. The net effect of the SRO's decision was therefore to require reimbursement for L.K.'s MCC tuition, i.e., the component of L.K.'s placement that the school district had *not* been funding.

Two weeks after the SRO's decision, the Parents filed a complaint in federal court. Dkt. No. 1. The Parents moved for summary judgment on May 13, 2015, and the Department cross-moved for summary judgment on June 17, 2015. Dkt. Nos. 18, 25. These motions were fully briefed as of July 29, 2015.

## II.   LEGAL STANDARD

Although "[t]he responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers," their rulings are "subject to 'independent' judicial review" when an aggrieved party brings suit in federal court. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). This "independent, but circumscribed, review" is "more critical than clear-error review but well short of complete *de novo* review." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quotation marks, citation, and alterations omitted). Accordingly, although the IDEA imposes a "preponderance of the evidence" standard, 20 U.S.C. § 1415(i)(2)(C)(iii), courts must give "due weight" to state administrative proceedings and should afford "particular deference where 'the state hearing officers' review has been thorough and careful.'" *T.K.*, 810 F.3d at 875 (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240–41 (2d Cir. 2012)). As the Second Circuit has cautioned, courts must remain mindful that they

"lack 'the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* (quoting *M.H.*, 685 F.3d at 240). Courts should not, however, give "due weight" to a state hearing officer's resolution of an issue of law because "state hearing officers are not more experienced or expert than courts in interpreting federal statutes or the federal constitution." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (quotation marks, citation, and alteration omitted).

### III. DISCUSSION

This case presents, in essence, two questions: First, did the SRO correctly determine that the IDEA permits a reduction in reimbursement, as a matter of equity, when parents procure services over and above those that would satisfy the state's obligation to provide a FAPE? Second, if so, was the SRO correct that a reduction in reimbursement is appropriate here, given the home and community-based services that the Parents chose to provide for L.K.? The Court concludes that the answer to both questions is "yes."

#### A. Reductions in Reimbursement Under the Equities Prong of *Burlington/Carter*

The Supreme Court made clear in *Florence County School District Four v. Carter By & Through Carter* that when courts award equitable relief under the IDEA, they "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." 510 U.S. 7, 16 (1993). But the Court did not provide much in the way of guidance for lower courts, other than to indicate that "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was *unreasonable*." *Id.* (emphasis added); *see also* 20 U.S.C. § 1412(a)(10)(C)(iii) ("The cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents."). Here, the SRO in effect determined that it is unreasonable (as a matter of IDEA law, not as a matter of parental choice) for parents to provide services that exceed a state's obligations under the IDEA. *See* SRO Op. at 11 ("[T]he district is only required to pay for expenses to address the student's needs that it would have borne in the first instance had it offered the student

9

a FAPE."). The Parents, however, contend that this constitutes "a rogue and unprecedented reimbursement restriction" and that they "amply met the controlling . . . standard for full reimbursement." Pl. Br. 15. The Court disagrees.

As an initial matter, despite the force of the Parents' criticism of the SRO's decision, they never actually articulate what they believe to be the standard that courts should apply when deciding whether to deny full reimbursement. Instead, the Parents emphasize that "[t]he Prong III analysis goes *primarily* to parent cooperation and good faith in the IEP development process." *Id.* (emphasis added). As a descriptive matter, they are correct that courts often look to whether the parents have acted in good faith in deciding whether equitable considerations cut in favor of reducing the parents' reimbursement. For instance, Judge McMahon recently explained that, "[a]t the third and final step of the *Burlington–Carter* test . . . [c]ourts have considered a variety of factors," including:

> [W]hether the parents cooperated with the CSE (e.g., providing reports, attending the meeting, participating in the meeting); whether the parents timely notified the school district of their intent to place their child in a private school; whether the parents visited the DOE's proposed placement; whether the parents intended to genuinely consider a proposed public placement, or whether they would have kept their child in private school regardless of the proposed public placement; whether the parents or the DOE unreasonably delayed anything; and the appropriateness of the DOE's conduct.

*GB v. N.Y.C. Dep't of Educ.*, No. 14-CV-9951 (CM), 2015 WL 7351582, at *19 (S.D.N.Y. Nov. 5, 2015) (internal citations omitted). Here, the Department does not claim (nor could it credibly) that the Parents acted in bad faith during the IEP process. As such, if reimbursement hinged *only* on equitable factors relating to parental conduct, the Parents might prevail. But *Carter* forecloses that possibility by instructing courts to deny total reimbursement in the face of unreasonable cost. *See* 510 U.S. at 16. Courts therefore must have leeway to award less-than-full reimbursement to parents who act in good faith.

The question, then, is whether the cost of a service can be "unreasonable" under *Carter* if the service is not one the state was required to offer in order to provide the student a FAPE. The Second Circuit adopted this view in *Still v. DeBuono*, a case where the court considered the

10

question of reimbursement in the context of a provision of the IDEA that governs infants and toddlers with disabilities. 101 F.3d 888, 891 (2d Cir. 1996); *see also id.* at 892 (noting that the Supreme Court's holdings in *Burlington* and *Carter*, which pertained to a different section of the IDEA, also "fit well in the context" of the infants and toddlers section). In *Still*, the district court had dismissed the New York City Department of Mental Health, Mental Retardation and Alcoholism Services' ("DOMH") challenge to a state administrative decision awarding full reimbursement to a parent, and the Second Circuit affirmed. *Id.* at 890, 894. In rejecting the DOMH's appeal, the court addressed the concern that its holding would expose the DOMH to significant financial liability. *Id.* at 893. The court noted that local governments could "avoid liability exposure simply by providing appropriate services for children at the outset," but it also emphasized the Supreme Court's holding in *Carter* that "parents will not be able to seek reimbursement unless the cost of the private services is reasonable." *Id.* The court clarified that the "appropriate amount" of reimbursement "bears a relationship to the quantum of services that the state would have been required to furnish" if it had complied with its IDEA obligations at the outset. *Id.* In other words, a state need not worry about being saddled with crippling financial obligations because the IDEA does not require the state to reimburse the cost of private services that go above and beyond what the state would have been required to provide.

Judge Lynch adopted the Second Circuit's interpretation of reasonableness in *Board of Education of the City School District of the City of New York v. Gustafson*. *See* No. 00-CV-7870 (GEL), 2002 WL 313798, at *7 (S.D.N.Y. Feb. 27, 2002). He explained that although *Carter* "did not suggest what factors should be considered to evaluate reasonableness," the "Second Circuit . . . interpreted 'reasonable'" in *Still* to require a relationship between the amount of reimbursement and the quantum of services that the state would have been required to provide. Judge Lynch offered an important caveat, however, to the principle that a court should reduce reimbursement when parents pay for more services than the state would have been obligated to offer. In *Gustafson*, the IHO had decided that equitable considerations required reimbursing the mother of a student enrolled in a private school for only 20% of the cost of tuition. *Id.* at *2.

The IHO reasoned that the student did not require a full-time special education program, and that the 20% figure represented roughly the cost of the special education services provided to the student at the private school. *Id.* The SRO, however, reversed the IHO's decision, and the district court affirmed. *Id.* at *1. The court, the SRO, and IHO all agreed that the student "received more services than would have been provided under a proper IEP within the public schools." *Id.* at *2-3, *7. But, the court explained, "these added benefits are inextricably linked to the substitution of most private programs for public ones." *Id.* at *7. Given that "the Board [had] failed to propose a proper IEP, [and] the parent [had] found an appropriate placement," the court held that "full tuition reimbursement provide[d] the least arbitrary and most equitable result" because the record made it impossible to "identify[] a *segregable service* for which the cost can reasonably be estimated." *Id.* (emphasis added). Put differently, when a school district fails to provide a FAPE, parents that place their children in private programs will often end up paying for services that go beyond what the school district would have been required to provide if it had fulfilled its obligations under the IDEA in the first place. Parents should not be denied full reimbursement in each of these cases, as that would unfairly punish parents for finding an appropriate private placement. Rather, parents' reimbursement should only be reduced if there are identifiable services, whose costs can reasonably be estimated, that are segregable from the rest of the private program and that exceed the services that constitute a FAPE.

The Third Circuit and the Ninth Circuit have each interpreted the IDEA along these lines. In *C.B. ex rel. Baquerizo v. Garden Grove Unified School District*, the Ninth Circuit held that the guardian of a student who had been denied a FAPE was entitled to full reimbursement for the cost of private schooling, even though the private school did not meet all of the student's needs. 635 F.3d 1155, 1157-58 (9th Cir. 2011). In reaching that holding, the court rejected the school district's argument that the district court, in considering the equities associated with reimbursement, should have "reduce[ed] [the] Guardian's reimbursement commensurate with the missing elements of [the student's] special educational needs." *Id.* at 1160. The court reasoned that it would not make sense to reduce a parent's reimbursement simply because the parent could

12

not afford a private placement that covered all of a student's needed services. *Id.* The court added, however, that "[e]quity surely *would* permit a reduction from full reimbursement if [a private placement] provides too much (services beyond required educational needs), or if it provides some things that do not meet educational needs at all (such as purely recreational options), or if it is overpriced." *Id.* (emphasis added). Similarly, the Third Circuit has indicated that courts should determine the appropriate amount of reimbursement "with reference to what is required by the IDEA to provide an appropriate education." *Warren G. ex rel. Tom G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 86 (3d Cir. 1999).

As explained above, the Parents do not offer a competing interpretation of Prong III of the *Burlington/Carter* test. Nor do they dispute the Department's reliance on *Still* or *C.B.* (the Ninth Circuit case). *See* Def. Br. 22.[4] The only argument the Parents make on this point is that the Department should not be allowed to argue "excessive cost" because it never raised that argument below. Pl. Reply Br. 6. The Department did argue, however, that certain after-school services that L.K. received were not necessary and further contended that the "[e]quities do not favor the parents." Def. IHO Br. 7-9. That is the argument the Department repeats here. And even if the Department had not raised this issue below, it would be a strange state of affairs if the Department were prohibited from defending the SRO's decision by relying on the very arguments and cases cited by the SRO.

---

[4] The Parents do cite to a Second Circuit case where the court reserved the question of whether to reduce reimbursement based on services that were unnecessary to the provision of a FAPE (though the Parents cite the case for an unrelated proposition). *See M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 255 n.12 (2d Cir. 2012) ("We take no position on whether anything short of total reimbursement for P.H.'s private tuition at BAC would have been appropriate under the Supreme Court's decision in *Carter* . . . had the DOE identified . . . particular services provided by BAC that the district considered unnecessary to the provision of a FAPE."). The court reserved that question, however, in light of the fact that the district court and the IHO had concluded that the equities supported full reimbursement and the Department did not "contest the district court's or IHO's evaluation of [the] evidence on appeal." *Id.* at 254. Viewed in this light, the Second Circuit's decision to invoke the specter of reduced reimbursement for unnecessary services supports the Court's conclusion that such reductions are permissible under the IDEA.

13

In sum, the Court holds that it may reduce the reimbursement awarded to the Parents on the basis of any segregable services that the Parents provided over and above what the Department would have been required to offer L.K. to provide a FAPE.

### B. The SRO's Evaluation of the Equities

Having determined that the SRO articulated the correct legal rule for deciding when equitable considerations permit a reduction in reimbursement, the Court turns to the question of whether the SRO applied that rule correctly to the facts of this case. The SRO found "that the hearing record does not support a conclusion that the student required *all* of the home and community-based services the parents obtained for him." SRO Op. at 11 (emphasis added). Specifically, he determined that "equity does not require . . . the district to reimburse the parents for home and community-based services for the purpose of the generalization of skills, in addition to the school day services at [MCC]." *Id.* In other words, the SRO concluded that the Parents should not be reimbursed for services that seek *only* to generalize L.K.'s skills outside of the school context. The Court agrees.

At the outset, it is important to note the degree of educational progress that the IDEA mandates for each student. As the Second Circuit has emphasized, "school districts are not required to 'maximize the potential' of students with disabilities, but instead must offer only 'a basic floor of opportunity.'" *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 221 (2d Cir. 2014) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 200 (1982)). Accordingly, a school district must formulate an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. This means an education "that is likely to produce progress, not regression," and requires more than just "the opportunity for only trivial advancement." *Walczak*, 142 F.3d at 130 (internal quotation marks and citations omitted).

Under this framework, services that seek only to generalize skills may not be required to provide a FAPE. As the SRO noted, "[s]everal courts have held that the IDEA does not require school districts as a matter of course to design educational programs to address a student's

14

difficulties in generalizing skills to other environments outside of the school environment." SRO Op. at 9 (citing cases). This is particularly true "in cases in which it is determined that the student is otherwise likely to make progress in the classroom." *Id.* In *P.S. v. New York City Department of Education*, for instance, the court upheld the SRO's determination that a student did not require home-based programming because "the primary purpose of [the student's] home-based services appeared to be 'generalization' of behaviors learned in the school setting to the home setting." No. 13-CV-4772 (LGS), 2014 WL 3673603, at *13-14 (S.D.N.Y. July 24, 2014). The Parents argue that *P.S.* is inapposite because the court decided that case on Prong I, not Prong III, of the *Burlington/Carter* test. Pl. Reply Br. 6. But as the Department persuasively argues, *P.S.* stands for the proposition that services that seek to generalize a student's skills are not necessary to the provision of a FAPE. Def. Reply Br. 7. And as the Court explained above, courts must consider the question of reimbursement, at Prong III of the analysis, through the lens of the services that the Department would have been responsible for in the first instance, i.e., the inquiry required at Prong I.

Moreover, courts outside this circuit have reached the same conclusion that the generalization of skills often is not a component of a FAPE. The Eleventh Circuit, for instance, "has specifically held that generalization across settings is not required to show an educational benefit" under the IDEA. *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1293 (11th Cir. 2001). Rather, "[i]f 'meaningful gains' across settings means more than making measurable and adequate gains in the classroom, [such gains] are not required by [the IDEA]." *Id.* (quotation marks and citation omitted). The Tenth Circuit likewise has held that "generalization skills need not always be included in, and progress on such skills is not necessary to ensure, a compliant IEP." *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1152 (10th Cir. 2008). But in *Thompson*, the court also emphasized that "the Supreme Court has cautioned against 'establish[ing] any one test for determining the adequacy of educational benefits conferred upon all children covered by the [IDEA].'" *Id.* (quoting *Rowley*, 458 U.S. at 202). Accordingly, the court noted "that at least one other court has suggested that in some instances difficulty

generalizing skills may be so severe that it prevents a student from receiving *any* educational benefit." *Id.* (emphasis in original) (citing *Gonzalez v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 353 (1st Cir. 2001)). The Court agrees that, if a student's difficulty in generalizing skills prevents him from making the progress required under the IDEA—i.e., if it prevents the student from making more than "trivial" progress—then a school district would have to offer services that seek to improve generalization in order to provide a FAPE. But once a student is making the required progress, the IDEA does not demand that school districts offer such additional services, nor does it require reimbursement for such additional services in cases where the district has failed to provide a FAPE.

The Parents do not meaningfully contest this rule, nor do they engage with any of the cases the Department cites on the issue of generalization, other than *P.S. See* Def. Reply Br. 7. Instead, the majority of the Parents' briefing emphasizes the severity of L.K.'s disabilities and the importance of all the services he receives in enabling him to make progress. For example, the Parents argue that "[t]he underlying record is replete with evidence supporting L.K.'s *need* for home and community-based services in addition to a school based component." Pl. Br. 12 (emphasis in original). The Court agrees with that assessment of the record, but that agreement is not enough to resolve this case. The SRO did not find that the Parents should not have provided L.K. with *any* home and community-based services. Rather, the SRO concluded that L.K. did not require *all* of the home and community-based services he received. SRO Op. at 11.[5] The question, therefore, is not *whether* the Parents should be reimbursed for these additional services, but for *which* services. In fact, given that the Department has already reimbursed the Parents for the home and community-based services they provided in 2013-2014, the question in this case is even narrower: whether the record supports the SRO's conclusion that there are at

---

[5] The Department appears to misread the SRO's decision on this point. It claims that "[t]he SRO . . . determined that the DOE is not required to fund the Additional Services that Parents elected to provide for the Student during the 2013-2014 school year." Def. Br. 15. But as explained above, the SRO's decision was more nuanced than the Department now claims.

16

least *some* services that L.K. received that the Department should not be required to reimburse. If the answer to that question is "yes"—and the Court concludes that it is—then the fact-bound question of which particular services do not merit reimbursement will be resolved in future litigation over L.K.'s education.

In reviewing the SRO's conclusion on this narrow question, the Court is mindful of its responsibility to give the SRO's decision "due weight." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016). This is particularly true where, as here, "the state hearing officer['s] review has been thorough and careful." *Id.* (quotation marks and citation omitted). The Parents claim that the SRO's decision does not warrant deference because he "flatly ignored the compelling evidentiary record that proved L.K. *does* require the services and that the services are *necessary* for him to make meaningful educational progress." Pl. Reply Br. 6 (emphases in original). The SRO did no such thing. In fact, the SRO spilled considerable ink discussing the evidence that was favorable to the Parents. For instance, he noted that one of L.K.'s community-based ABA therapy providers testified that the 18 hours of after-school ABA therapy L.K. received were "required in order for the student to make meaningful progress." SRO Op. at 9-10. And at a higher level of generality, the SRO correctly observed that "[e]ach of the student's providers testified to the need for a home-based component in order for the student to derive benefit from his education." *Id.* at 10.

On the other hand, the SRO noted that many of L.K.'s providers testified to the difficulty L.K. has in generalizing skills and the value of home and community-based services on that front. For instance, the occupational therapist at MCC explained that L.K. "has difficulty generalizing his skills, and the home program in conjunction with MCC enables him to work on generalizing across different setting." Ex. SSS at 9[6]; *see also* SRO Op. at 10. To be sure, the same therapist indicated that L.K. "requires a home program that includes OT in order to continue making meaningful progress." Ex. SSS at 9. And the Parents cite many places in the

---

[6] Letter exhibits, e.g., "Ex. __" refer to the Parents' exhibits introduced during the administrative proceedings. Those exhibits are a part of the administrative record, which has been filed under seal with the Court.

17

record where L.K.'s providers have indicated that some amount of home and community-based services are necessary for him to continue making meaningful progress. *See* Pl. Reply Br. 4-5. But as the SRO noted, the evidence in the record also indicated that L.K. had made progress in the year prior to the 2013-2014 school year, despite having received "significantly fewer hours of home and community-based services and attending a general education preschool program with SEIT [Special Education Itinerant Teacher] services." SRO Op. at 11; *see also, e.g.*, Ex. H at 5 (letter from the Director of ABA services at L.K.'s preschool indicating that "[h]e has learned to play a game with another person," and that "[o]ver the past school year, [L.K.] with SEIT support can imitate a peer group in a structured situation"). In sum, the record reflects the SRO's conclusion: that although L.K. required some amount of additional services outside his enrollment at MCC, he did not need *all* of those services to make the level of educational progress required by the IDEA. Accordingly, the Court holds that the SRO did not err in determining that the Parents are entitled to less than total reimbursement for the full slate of additional services that were provided to L.K. during the 2013-2014 school year.[7]

Like the SRO, the Court need not decide which specific home and community-based services exceeded the requirements of the IDEA. As explained above, L.K.'s pendency entitlement required the school district to pay for all of the additional services that L.K. received during the 2013-2014 school year, so the Parents do not need to be reimbursed for those services. If the Court needed to reach the issue of reimbursement, however, its task would not be to simply estimate the value of the services that L.K. received and compare that to the cost of providing

---

[7] The Parents have introduced one piece of evidence that was not before the SRO: an affidavit from Dr. Amy Davies-Lackey, the educational coordinator at MCC. *See* Dkt. No. 21. The parties dispute whether the Court is permitted to consider this evidence, pursuant to the provision of the IDEA that requires courts to "hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii). Although Dr. Davies-Lackey submitted an affidavit that was considered during the state administrative proceedings, *see* Ex. RRR, her new affidavit indicates that, at the time of her first affidavit, she was of the opinion that L.K. "fit the 'severity' profile of the kind of student who would be at risk for a residential placement if he were not adequately supported both in and out of school." Dkt. No. 21 ¶ 4. The Court assumes, without deciding, that it must consider this evidence, as consideration of the evidence does not alter its resolution of the case. As with the rest of the testimony that the Parents cite, the second Davies-Lackey affidavit reaffirms the value that L.K.'s providers placed on his home and community-based services. But the second affidavit does not shed any additional light on which of those services are necessary to enable L.K. to continue making the progress required by the IDEA.

L.K. with a FAPE. Rather, per *Gustafson*, the Court would have to identify segregable services, whose cost could reasonably be estimated, that exceed the school district's obligations under the IDEA. 2002 WL 313798, at *7. By way of example, if the Court were to decide that L.K. required only two SLT sessions per week (rather than the four he received) in order to make meaningful educational progress, then the Court would be justified in reducing the Parents' reimbursement by the cost of the two additional SLT sessions. But absent this kind of particularized finding, no reduction in reimbursement would be warranted.

### C. Attorneys' Fees

The Parents seek a determination from the Court that they have standing to seek attorneys' fees and costs. The IDEA permits courts to "award reasonable attorneys' fees . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). The Second Circuit has held that "a winning party in an IDEA administrative proceeding is a 'prevailing party.'" *Mr. L. v. Sloan*, 449 F.3d 405, 407 (2d Cir. 2006). Given that the Department does not contest the Parents' eligibility to seek attorneys' fees, the Court holds that the Parents were a "prevailing party" within the meaning of the IDEA when the SRO sustained their appeal of the IHO's decision.

### IV. CONCLUSION

For the foregoing reasons, the Department's motion for summary judgment is GRANTED, and the Parents' motion for summary judgment is DENIED with respect to their challenge to the SRO's decision and GRANTED with respect their request to be deemed "prevailing parties." The Parents shall submit a motion for attorneys' fees no later than fourteen days from the date of this Memorandum and Order.

This resolves Docket Nos. 18 and 25.

SO ORDERED.

Dated: March ___, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge